**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

|  |  |  |
|---|---|---|
| DOUGLAS EBERLINE, | ) | |
| | ) | |
| Petitioner, | ) | No. 23-655 |
| | ) | |
| v. | ) | Filed: May 29, 2026 |
| | ) | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | ) | Re-issued: June 15, 2026* |
| | ) | |
| Respondent. | ) | |
| | ) | |

**OPINION AND ORDER**

Petitioner Douglas Eberline ("Petitioner") seeks review of the Chief Special Master's decision denying compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.* ("Vaccine Act"). Petitioner alleges that he suffered from polymyalgia rheumatica ("PMR") after receiving a pneumococcal vaccine on August 19, 2020, and an influenza vaccine on September 12, 2020. The Chief Special Master denied compensation on the basis that Petitioner failed to establish by a preponderance of the evidence that these vaccines can cause PMR. In accordance with Rules 23 and 24 of the Vaccine Rules of the United States Court of Federal Claims ("Vaccine Rules"), Petitioner filed a Motion for Review in this Court, arguing that the Chief Special Master abused his discretion by refusing to consider Petitioner's supplemental evidence and erred in denying compensation. For the reasons explained below, the Court **DENIES** Petitioner's Motion.

---

\* The Court issued this Opinion and Order under seal on May 29, 2026, and directed the parties to file any proposed redactions, pursuant to Vaccine Rule 18(b), by June 12, 2026. As the parties did not propose any redactions, the Court reissues the Opinion and Order publicly in full. *See* Vaccine Rule 18(d).

## I.  BACKGROUND

### A.    Petitioner's Medical History, Vaccination, and Symptoms

On August 19, 2020, Petitioner received a pneumococcal vaccine.  Pet'r's Ex. 6 at 1, ECF No. 6-6; Pet'r's Ex. 4 at 9, ECF No. 6-4.  Approximately three weeks later, on September 12, 2020, Petitioner was immunized with the influenza vaccine as well.[1]  Pet'r's Ex. 1 at 2, ECF No. 6-1. Prior to receiving these vaccines, Petitioner's medical records included a history of carpal tunnel syndrome,[2] and osteoarthritis[3] in his right knee.  *See, e.g.*, ECF No. 6-4 at 25 (reporting Petitioner's history of carpal tunnel syndrome dating to 2004); Pet'r's Ex. 5 at 73–75, ECF No. 6-5 (reporting Petitioner's December 14, 2016 diagnosis of osteoarthritis in the right knee).

Petitioner first complained of symptoms following these vaccinations on October 9, 2020, when Petitioner saw orthopedist Vimala Ramachandran, M.D.  Pet'r's Ex. 3 at 15, ECF No. 6-3. Petitioner described "constant numbness, tingling, and burning sensations in his bilateral hands," and noted that the pain had been present "for about a month."  *Id.*  Dr. Ramachandran's reported assessment was "[b]ilateral carpal tunnel syndrome," which Dr. Ramachandran planned to treat by

---

[1] The vaccinations were separated by 24 days but both parties' experts, and the Chief Special Master, at times refer to this period as approximately one month.  *See* Pet'r's Ex. 26 at 12, ECF No. 19-1 (Petitioner's expert stating that the vaccinations were separated by "one month"); Resp't's Ex. A at 5, ECF No. 18-1 (Respondent's expert describing the vaccinations as separated by "a month"); Entitlement Dec. at 2, ECF No. 28 (Chief Special Master referring to the period as "almost one-month").  Whether this interval is most accurately characterized as 24 days, three weeks, or one month is immaterial to the parties' arguments.

[2] Carpal tunnel syndrome is "an entrapment neuropathy characterized by pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow.  Symptoms result from compression of the median nerve in the carpal tunnel."  *Dorland's Illustrated Medical Dictionary* 1794 (33d ed. 2020).

[3] Osteoarthritis is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane.  It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity."  *Dorland's Illustrated Medical Dictionary*, *supra* note 2, at 1326.

ordering an electromyography ("EMG") test,[4] providing Petitioner with wrist braces to wear at night, and instructing him to apply heat and ice in addition to over-the-counter medication to alleviate the pain. *Id.* at 16.

One week later, on October 16, 2020, Petitioner reported joint stiffness—especially in his fingers, but also in his hips, knees, shoulders, wrists, and hands—to his primary care provider, Michaela M. Skelly, M.D. ECF No. 6-4 at 30. Petitioner felt that this pain had worsened after he received the pneumococcal and influenza vaccines. *Id.* Dr. Skelly assessed that the pain may be due to Petitioner's carpal tunnel syndrome but also recorded unspecified joint and hand pain. *Id.* at 33–34. Based on this assessment, Dr. Skelly prescribed prednisone[5] and ordered x-rays and lab tests to "check[] for inflammation and rheumatoid arthritis and other autoimmune conditions." *Id.* The lab results indicated that Petitioner's erythrocyte sedimentation rate ("ESR")[6] and C-reactive protein ("CRP")[7] levels were somewhat elevated. *Id.* at 170; Pet'r's Ex. 2 at 13, ECF No. 6-2.

Based on the results of the lab tests, on November 3, 2020, Petitioner saw rheumatologist Physician's Assistant ("PA") Rachel Herrin. *See* ECF No. 6-2 at 10–14. After reviewing Petitioner's lab results and performing a physical exam, *id.* at 10–13, PA Herrin discussed with

---

[4] EMG is "an electrodiagnostic technique for recording the extracellular activity . . . of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation." *Dorland's Illustrated Medical Dictionary*, *supra* note 2, at 595.

[5] Prednisone is "a synthetic glucocorticoid derived from cortisone, administered orally as an anti[-]inflammatory and immunosuppressant in a wide variety of disorders." *Dorland's Illustrated Medical Dictionary*, *supra* note 2, at 1486.

[6] ESR is "the rate at which erythrocytes precipitate out from a well-mixed specimen of venous blood." *Dorland's Illustrated Medical Dictionary*, *supra* note 2, at 1569. Elevated ESR may reflect, among other things, "inflammatory disease." *Id.*

[7] CRP is "a globulin that forms a precipitate with the somatic C-polysaccharide of the pneumococcus in vitro; it is the most predominant of the acute-phase proteins." *Dorland's Illustrated Medical Dictionary*, *supra* note 2, at 1509.

Petitioner "possible causes of [Petitioner's] pain," including "inflammatory arthritis, PMR, [or] reactive arthritis," *id.* at 14. PA Herrin also noted that Petitioner's "body may have just been reacting to having 2 shots done within a short period of time." *Id.* PA Herrin ordered repeat lab tests and instructed Petitioner to continue with injections through his orthopedist. *Id.* The results of Petitioner's EMG test were "compatible with [] mild carpal tunnel syndrome" and "non[-]localized ulnar [] neuropathy[] across the elbow," on the left side. Pet'r's Ex. 11 at 3, ECF No. 7-2. On reviewing Petitioner's repeat lab results, PA Herrin observed that Petitioner's CRP levels remained elevated and prescribed more prednisone on November 13, 2020. ECF No. 6-2 at 15.

Petitioner visited PA Herrin for a follow-up appointment on December 21, 2020, reporting that "[t]he prednisone ha[d] helped a lot with his joint pains" and "[h]is joints [were] feeling great." *Id.* at 16. Upon examining Petitioner, PA Herrin observed generalized joint stiffness and muscle aches. *Id.* PA Herrin recorded that she was "[s]till leaning more toward PMR or reactive arthritis" as the likely cause of Petitioner's pain "given all [Petitioner's] recent vaccines, shots, etc[.]," and continued to prescribe prednisone, ordered repeat lab tests, and scheduled a follow-up visit for the following month. *Id.* at 20.

Petitioner's next visit occurred on January 12, 2021, when Petitioner saw Vijayabhanu Mahadevan, M.D., the doctor who had concurred with PA Herrin's treatment plans during previous visits. *See id.* at 14, 20–21. At that appointment, Plaintiff reported minimal stiffness but no joint pain or swelling. *Id.* at 21. Dr. Mahadevan noted that Petitioner's most recent lab results were normal, and she was "[s]till leaning more toward PMR" as a possible cause of Petitioner's pain, "even though symptom onset was after flu/pneumonia vaccination." *Id.* at 24. Dr. Mahadevan recommended Petitioner begin reducing his prednisone given his lack of symptoms and normal lab results. *Id.*

4

Petitioner visited PA Herrin three additional times between March and June 2021, reporting improved symptoms while tapering his prednisone. *See id.* at 25 (reporting on March 11, 2021, that Petitioner was "feeling much back to his normal self and [was] hoping to work on getting off of prednisone"); *id.* at 30 (reporting on May 5, 2021, that Petitioner experienced "[n]o major flaring of PMR symptoms [while] going from 5 mg to 4 mg" of prednisone); *id.* at 35 (reporting on June 30, 2021, that Petitioner felt "pretty well" after further reducing his prednisone dosage). Petitioner stopped taking prednisone by August 2021. Pet'r's Ex. 7 at 9, ECF No. 6-7.

Petitioner saw his orthopedist, Dr. Ramachandran, on July 23, 2021, reporting that "the numbness and tingling ha[d] worsened in his hands." ECF No. 6-3 at 11. At that appointment, Petitioner decided he would like to proceed with surgery to alleviate his carpal tunnel symptoms. *Id.* at 12. Dr. Ramachandran performed a carpal tunnel release procedure on Petitioner's right side on August 5, 2021. *Id.* at 23–24. Dr. Ramachandran performed a carpal tunnel release procedure on Petitioner's left side on November 4, 2021. *See* Pet'r's Ex. 12 at 30–31, ECF No. 7-3. The following spring, Petitioner continued to report stable conditions and maintained normal lab results at follow-up visits with his rheumatologist, Dr. Mahadevan. *See* ECF No. 6-7 at 16–25 (describing visits in February and May 2022).

### B.    Procedural History

Petitioner filed his petition for compensation on May 4, 2023. *See* Pet. for Comp., ECF No. 1. He requested compensation under the Vaccine Act for PMR symptoms allegedly caused by either a pneumococcal vaccine, an influenza vaccine, or both vaccines together. *See id.* ¶¶ 4, 11, 19. The Vaccine Act establishes a no-fault system whereby individuals who are injured by covered vaccines may receive compensation. *See generally* 42 U.S.C. § 300aa-10(a). The Vaccine Act's Injury Table ("Table") outlines conditions with known links to covered vaccines, along with a time period for the expected manifestation of each condition. *Id.* § 300aa-14. A petitioner may

5

presumptively establish entitlement to compensation by showing that he sustained or significantly aggravated a Table condition within the period for manifestation or aggravation provided in the Table. *Id.* § 300aa-11(c)(1)(C)(i). If, however, the petitioner's condition does not meet the Table's requirements (*i.e.*, either the condition is not listed or the manifestation or significant aggravation occurred outside of the time period listed), the petitioner must establish that the covered vaccine caused the injury in order to recover. *Id.* § 300aa-11(c)(1)(C)(ii). Petitioner asserts that the influenza and pneumococcal vaccines actually caused or significantly aggravated Petitioner's PMR, which is not a Table condition. *See* ECF No. 1 ¶¶ 4, 11, 19. Given that Petitioner could not rely on the Table's presumption, the parties spent several months gathering evidence and expert reports. Each party retained one expert.

      1.      <u>Expert Reports</u>

      *a.*      *Petitioner's Expert Report*

Petitioner's expert, Petros Efthimiou, M.D., a Fellow of the American College of Rheumatology who has researched inflammatory rheumatic conditions (including PMR) for 24 years, opines that Petitioner's receipt of the influenza vaccine on September 12, 2020 "more likely than not was a substantial factor contributing to the onset of clinical [PMR]." Pet'r's Ex. 16 at 1–2, ECF No. 16-2; *see also* Pet'r's Ex. 17, ECF No. 16-3 (Dr. Efthimiou's curriculum vitae). Petitioner filed Dr. Efthimiou's initial report on May 20, 2024, in which Dr. Efthimiou concludes that Petitioner's medical records establish that he suffered from PMR. *Id.* at 3–10. Dr. Efthimiou describes PMR as "a condition characterized by inflammatory pain and stiffness in the shoulder and in the pelvic girdle and neck." *Id.* at 10. Dr. Efthimiou further explains that PMR "occurs in people over the age of 50, and is associated with an acute-phase response, a rapid response to low doses of glucocorticoids [], and a generally favorable prognosis." *Id.* He goes on to explain that PMR is currently understood to be "an immune-mediated disease that includes the interaction of

multiple factors, both genetic and environmental." *Id.* (citing Pet'r's Ex. 18, Dario Camellino et al., *Pathogenesis, Diagnosis and Management of Polymyalgia Rheumatica*, 36 Drugs & Aging 1015 (2019), ECF No. 16-4).

As support for his conclusion that Petitioner's receipt of the influenza vaccine likely contributed to his PMR, Dr. Efthimiou relies on various pieces of medical and scientific literature documenting instances of PMR where vaccines may have been an environmental trigger. *See id.* For example, Dr. Efthimiou cites a case series that discussed "multiple cases" of PMR or giant cell arteritis ("GCA") associated with influenza vaccination. *Id.* (citing Pet'r's Ex. 19, A. Soriano et al., *Giant Cell Arteritis and Polymyalgia Rheumatica After Influenza Vaccination: Report of 10 Cases and Review of the Literature*, 21 Lupus 153 (2012), ECF No. 16-5). Dr. Efthimiou notes that the case series included a table of literature that similarly found cases of PMR associated with the receipt of the influenza and tetanus vaccines. *Id.* (citing ECF No. 16-5 at 3 tbl. 2). Dr. Efthimiou also cites another case series that discussed "10 patients with GCA associated with [influenza] vaccine administration" and two "cases reporting symptoms of classical PMR after vaccination." *Id.* at 10–11 (citing Pet'r's Ex. 20, Eric Liozon et al., *Giant Cell Arteritis or Polymyalgia Rheumatica After Influenza Vaccination: A Study of 12 Patients and a Literature Review*, 20 Autoimmunity Revs. 102732 (2021), ECF No. 16-6).

In addition to these case reports and literature reviews, Dr. Efthimiou explains how the current pathological understanding of PMR supports the possibility that multiple vaccines are associated with the onset of PMR. *Id.* at 11. The medical community's current understanding of "inflammatory rheumatic diseases," Dr. Efthimiou opines, is a "spectrum between autoinflammatory diseases [] and autoimmune diseases []." *Id.* at 11 (citing Pet'r's Ex. 22, Elvis Hysa et al., *Immune System Activation in Polymyalgia Rheumatica: Which Balance Between*

7

*Autoinflammation and Autoimmunity? A Systemic Review*, 21 Autoimmunity Revs. 102995 (2022), ECF No. 16-8).  Thus, Dr. Efthimiou postulates that some diseases are "linked to being triggered by the innate immune response, whereas others are linked to being characterized by a dysregulated adaptive immune response." *Id.*

Next, Dr. Efthimiou explains how this understanding of PMR's pathogenesis supports his theory, describing how "PMR mechanistically arises due to the disruption of self-tolerance by specific types of T cells and the inability of T regulatory cells to prevent autoreactivity."[8]  *Id.* at 11–12.  In other words, "[t]he antigenic responses to the vaccine proteins contained in a vaccine could initiate autoreactive T cells that attack the body by providing either specifically or nonspecifically the necessary immune signals to ultimately dysregulate (i.e., lose self-tolerance) and activate the required autoreactive immune cells necessary for clinical disease expression." *Id.* at 12.  Dr. Efthimiou hypothesizes that "[t]hese autoreactive cells" may have already been present in Petitioner due to previously administered vaccines or other environmental factors.  *Id.*

Finally, Dr. Efthimiou explains how his theory that the influenza vaccine can cause PMR applies in Petitioner's case, based largely on the type of vaccines that Petitioner received as well as the timing of receipt.  *See id.* at 13–17.  In Dr. Efthimiou's medical opinion, because Petitioner had received the pneumococcal vaccine a few weeks prior to his influenza vaccine, Petitioner's immune system would have been "providing a 'peak' immune response" at the time he received the influenza vaccine. *Id.* at 13.  As support for this opinion, Dr. Efthimiou cites a study analyzing participants' innate immune responses to influenza and pneumococcal vaccinations, finding that both "are potent activators of the innate immune system." *Id.* at 14 (citing Pet'r's Ex. 25, Gerlinde

---

[8] T cells are "responsible for . . . cellular immunity."  *Dorland's Illustrated Medical Dictionary*, *supra* note 2, at 1070.

Obermoser et al., *Systems Scale Interactive Exploration Reveals Quantitative and Qualitative Differences in Response to Influenza and Pneumococcal Vaccines*, 38 Immunity 831 (2013), ECF No. 16-11).  Dr. Efthimiou notes that because both "vaccines are known to elicit B-cell responses in a T-cell dependent manner" Petitioner's receipt of the two vaccines within a few weeks of one another had the potential to "adversely trigger[] cross-reactive immune memory cells."  *Id.* at 15. In Dr. Efthimiou's opinion, therefore, Petitioner's "systemic autoimmune reaction, demonstrated by the development of [PMR], was likely triggered by the influenza vaccination he received in 2020."  *Id.* at 16.

       b.       *Respondent's Expert Report*

Respondent submitted an expert report from rheumatologist Maxime Kinet, M.D., Ph.D., who has evaluated and treated approximately three dozen individuals with PMR throughout his career and has published several peer-reviewed journal articles.  *See* Resp't's Ex. A at 1, ECF No. 18-1; *see also* Resp't's Ex. B, ECF No. 18-11 (Dr. Kinet's curriculum vitae).  In his report, Dr. Kinet concludes that "Dr. Efthimiou does not provide any reliable support for how influenza vaccination might have contributed to or caused [Petitioner's] symptoms" and therefore "there is no preponderance of evidence to support such [] causation."  *Id.* at 6.

At the outset of his report, Dr. Kinet explains that PMR "is a systemic inflammatory disorder of unclear etiopathogenesis affecting persons over fifty years old."  *Id.* at 4 (citing Resp't's Ex. A, Tab 1, Tanaz A. Kermani & Kenneth J. Warrington, *Polymyalgia Rheumatica*, 381 Lancet 63 (2013), ECF No. 18-2; and Resp't's Ex. A, Tab 2, Bhaskar Dasgupta et al., *2012 Provisional Classification Criteria for Polymyalgia Rheumatica: A European League Against Rheumatism/American College of Rheumatology Collaborative Initiative*, 71 Annals Rheumatic Diseases 484 (2012), ECF No. 18-3).  Dr. Kinet notes that PMR patients typically "present with bilateral pain and stiffness in the neck, shoulders, upper arms, hips, and thighs."  *Id.* (citing ECF

No. 18-2; ECF No. 18-3; and Resp't's Ex. A, Tab 3, Carlo Salvarani et al., *Polymyalgia Rheumatica and Giant-Cell Arteritis*, 347 NEJM 261 (2002), ECF No. 18-4).  In greater than 98% of PMR cases, Dr. Kinet observes, "[i]nflammatory markers, such as ESR or CRP, are elevated." *Id.* (citing Resp't's Ex. A, Tab 5, Fabrizio Cantini et al., *Erythrocyte Sedimentation Rate and C-Reactive Protein in the Evaluation of Disease Activity and Severity in Polymyalgia Rheumatica: A Prospective Follow-Up Study*, 30 Seminars in Arthritis & Rheumatism 17 (2000), ECF No. 18-6; and Resp't's Ex. A, Tab 6, Carlo Salvarani et al., *Acute-Phase Reactants and the Risk of Relapse/Recurrence in Polymyalgia Rheumatica: A Prospective Followup Study*, 53 Arthritis & Rheumatism 33 (2005), ECF No. 18-7).  Like Dr. Efthimiou, Dr. Kinet explains that in most cases of PMR, symptoms "improve promptly . . . with moderate doses of glucocorticoids."  *Id.* (citing ECF No. 18-2).  In discussing whether Petitioner's clinical presentation was consistent with PMR, Dr. Kinet concedes that Petitioner "may have suffered from PMR," but observes that "the distal predominance of his symptoms is somewhat unusual, as is the persistence of high inflammatory markers well after resolution of symptoms." *Id.*

Dr. Kinet next turns to Dr. Efthimiou's causal theory, which Dr. Kinet concludes is unsupported by the medical and scientific evidence.  *Id.* at 4–6.  Dr. Kinet explains that "PMR and influenza vaccinations are both exceedingly common occurrences."  *Id.* at 4.  Specifically, Dr. Kinet notes that the estimated lifetime risk of PMR for men is around two percent, *id.* (citing Resp't's Ex. A, Tab 7, Cynthia S. Crowson et al., *The Lifetime Risk of Adult-Onset Rheumatoid Arthritis and Other Inflammatory Autoimmune Rheumatic Diseases*, 63 Arthritis & Rheumatism 633 (2011), ECF No. 18-8), and over half of the adult population received the influenza vaccination during the 2019–2020 influenza season, *id.* (citing Resp't's Ex. A, Tab 8, Ctrs. for Disease Control & Prevention, *Flu Vaccination Coverage, United States, 2019–20 Influenza Season*,

10

https://www.cdc.gov/flu/fluvaxview/coverage-1920estimates.htm (2020), ECF No. 18-9). Dr. Kinet thus concludes that "chance association between these two very common events is likely." *Id.* And the studies Dr. Efthimiou cites "consist[] almost entirely of case reports and small case series of 20 patients or less, which are not sufficient to establish causation in the case of two common events." *Id.*

Dr. Kinet then explains that to "establish[] causation between a vaccine and a disease" medical experts "require that the natural infection against which the vaccine protects, being generally a stronger immune stimulus, should also cause the proposed disease." *Id.* (citing Resp't's Ex. A, Tab 9, Ami Schattner, *Consequence or Coincidence? The Occurrence, Pathogenesis and Significance of Autoimmune Manifestations After Viral Vaccines*, 23 Vaccine 3876 (2005), ECF No. 18-10). Dr. Kinet observes, however, that "leading PMR experts have published in top medical journals that a viral or other infectious cause [of] PMR has never been substantiated." *Id.* (citing ECF No. 18-2; ECF No. 18-4). Thus, Dr. Kinet opines that Dr. Efthimiou fails to provide reliable evidence that either the influenza vaccine, the pneumococcal vaccine, or their targeted pathogens can cause PMR. *Id.* at 5.

Turning to Dr. Efthimiou's purported pathogenic explanation of causation, Dr. Kinet concedes that Dr. Efthimiou's discussion of the "interplay between innate and adaptive arms of the immune system" and "environmental and other genetic factors" of pathogenesis is a "very well known" and "general concept of pathogenesis for autoimmune disorders." *Id.* at 5 (citing ECF No. 16-2 at 10–12). But, in Dr. Kinet's medical and scientific opinion, such a general concept fails to "provide specific evidence for how influenza and/or pneumococcal vaccination might lead to PMR." *Id.* Dr. Kinet explains that Dr. Efthimiou's report fails to "provide any biological mechanistic theory," *id.*, for how "antigenic responses to the vaccine proteins" could "initiate

11

autoreactive T cells that attack the body" leading to dysregulation and ultimately activating the immune cells necessary for expression of PMR, *id.* (quoting ECF No. 16-2 at 12). Dr. Kinet therefore concludes that "Dr. Efthimiou does not provide a specific and credible medical scientific theory for how vaccines might lead to PMR." *Id.*

Dr. Kinet also acknowledges that Petitioner may have possessed "a predisposition to PMR, if one grants that his reportedly similar episode of joint pain in 2010 or 2011 was PMR." *Id.* Yet, Dr. Kinet notes that Petitioner received "many vaccinations, including several closely spaced ones," over the intervening years without developing PMR. *Id.* Thus, "it is not clear why these closely spaced vaccinations, or any of [Petitioner's] other recent vaccinations, did not lead to PMR." *Id.*

Next, Dr. Kinet responds to Dr. Efthimiou's argument that the period of approximately three weeks between Petitioner's vaccinations increased Petitioner's immune response to the influenza vaccine. *Id.* (citing ECF No. 16-2 at 13). Dr. Kinet opines that Dr. Efthimiou's argument is unsupported by the cited study, which found that the "innate immune activation elicited by both [the pneumococcal and influenza] vaccines . . . peak[s] within hours to a few days." *Id.* at 5–6 (emphasis in original) (citing ECF No. 16-11). Thus, it is "not clear how vaccines separated by a month could produce this putative boosting phenomenon." *Id.* at 6. Dr. Kinet finds that Dr. Efthimiou's report "provides no reliable medical or scientific evidence for how [the] influenza vaccination alone or [the] two different vaccines spaced by a month would lead to PMR." *Id.*

Finally, Dr. Kinet opines that Dr. Efthimiou "provides no evidence" for his theory that cross-reactive immune memory cells triggered by the pneumococcal vaccine could lead to PMR. *Id.* (citing ECF No. 16-2 at 15). Even assuming that Dr. Efthimiou could support this theory with evidence that such cross-reactive cells might exist or that they could lead to autoimmunity or PMR,

12

Dr. Kinet notes that it is "not clear whether [Dr. Efthimiou] proposes that the cross-reactive cells react with pneumococcal proteins and self-antigens, pneumococcal proteins and influenza antigens, or all three." *Id.* Overall, Dr. Kinet concludes that "Dr. Efthimiou does not provide any reliable support for how influenza vaccination might have contributed to or caused [Petitioner's] symptoms." *Id.*

> c. *Petitioner's Rebuttal Expert Report*

On October 31, 2024, Petitioner filed a rebuttal report from Dr. Efthimiou responding to Respondent's expert report. *See* Pet'r's Ex. 26, ECF No. 19-1. Dr. Efthimiou emphasizes that his first report demonstrates that "reliable immunological mechanisms support a biological mechanistic 'theory' detailing how the immune response to a[n] [influenza] vaccine can adversely contribute at the mechanistic level to pathologically cause clinical symptoms of PMR illness." *Id.* at 2. Dr. Efthimiou further asserts that the medical literature supports his "biological mechanistic (scientific) theory explaining how vaccinations can pathologically cause the clinical onset of PMR." *Id.* Additionally, the "clinical literature" provides evidence that "the biological mechanisms being discussed, at least in theory, could have actually occurred in another patient." *Id.* at 2–3. Thus, Dr. Efthimiou explains, the lack of "biological certainty" as to "the specific innate immune culprit" causing the "adverse immune response" does not "automatically refute or reject" the medical and scientific reliability of Petitioner's "vaccine causal theory." *Id.* at 3.

Defending his causal theory, Dr. Efthimiou argues that "the safety of a causal factor should not be confused with whether there is a reliable and plausible biological mechanistic theory for how the two events can, especially in theory, be causally connected." *Id.* at 4. In response to Dr. Kinet's suggestion that the coincidence of two common events does not establish causation, Dr. Efthimiou explains that he is "not trying to establish that vaccine causation is medically certain or accepted in the general population studies." *Id.* at 5. Moreover, Dr. Efthimiou defends his reliance

on case reports which are published in medical literature for the purpose of "[d]iscussing putative associations," such as between vaccines and PMR. *Id.* at 6.

Overall, Dr. Efthimiou opines that "there are several biological mechanistic explanations that can reliably describe what can occur at the molecular level of causation" to explain how Petitioner's vaccines may have triggered PMR. *Id.* at 14. In Dr. Efthimiou's medical and scientific opinion either Petitioner's influenza "vaccine alone was [the] specific immune culprit that initiated an adverse immune response, or the [influenza] vaccine could have adversely influenced the already circulating pneumococcal immune cells present at the time administered." *Id.* Dr. Efthimiou concedes, however, that it is impossible to determine, at the molecular level, "which vaccine was 'more likely' the specific adverse immune contributor." *Id.*

2.    Briefing on Entitlement and Petitioner's Motion to Supplement the Record

After the parties filed their expert reports, the Chief Special Master set a briefing schedule for a ruling on the record. *See* Scheduling Order, Nov. 4, 2024. Because petitions alleging PMR as a vaccine injury "have routinely been dismissed," the Chief Special Master directed the parties to brief entitlement. *See* Entitlement Dec. at 1, ECF No. 28. On January 31, 2025, Petitioner filed his Motion for Ruling on the Record, *see* Pet'r's Evidentiary Br. Supp. Entitlement, ECF No. 21, as well as an additional piece of medical literature that was "cited in [Dr. Efthimiou's] rebuttal report" but "was inadvertently not filed," Notice Filing Ex. 31, ECF No. 20. In his motion, Petitioner argues that he suffered from PMR, a medically recognized rheumatological illness that was caused by his vaccinations. *See* ECF No. 21 at 1, 13–14, 18–23, 34–36. Following a 45-day extension, *see* Order Granting Mot. for Extension of Time, Feb. 24, 2025, Respondent filed his response to Petitioner's brief on April 14, 2025. *See* Resp. to Pet'r's Br. Supp. Entitlement, ECF No. 23. Respondent argues that Petitioner fails to offer a reliable medical or scientific theory

14

showing that the vaccines Petitioner received can cause PMR. *Id.* at 10–13. Petitioner filed his reply on April 30, 2025. *See* Pet'r's Rebuttal Br. Supp. Entitlement, ECF No. 24.

Nearly seven months later, on November 26, 2025, Petitioner filed a Motion for Leave to Proffer Supplemental Expert Report and Medical Literature. *See* ECF No. 26.[9] In the motion, Petitioner sought to introduce a supplemental report prepared by Dr. Efthimiou addressing two additional articles of medical literature. *See* Memo Supp. Pet'r's Mot. Suppl. Evidentiary R. at 8–9, ECF No. 26-1; Pet'r's Ex. 32, Jiyeon Oh et al., *Global Burden of Vaccine-Associated Rheumatic Diseases and Their Related Vaccines, 1967–2023: A Comprehensive Analysis of the International Pharmacovigilance Database*, 27 Int'l J. Rheumatic Disease 15294 (2024), ECF No. 26-2; Pet'r's Ex. 33, Koji Hayashi et al., *Polymyalgia Rheumatica Following Influenza B Infection: A Case Report*, 16 Cureus 70671 (2024), ECF No. 26-3; Pet'r's Ex. 34, ECF No. 26-4 (proffered supplemental report).

Petitioner explains that the articles, both of which were published prior to the filing of Dr. Efthimiou's rebuttal report and the parties' subsequent briefing on entitlement, had only "been discovered" during the "intervening seven [] months" as Petitioner's counsel "continued to work with Dr. Efthimiou" on additional Vaccine Act cases "involving the same general causation theory as [Petitioner's] particular case." ECF No. 26 ¶¶ 8–9. The first proffered supplemental article consists of a 2024 study comparing the rates of reports of six types of rheumatic diseases following vaccination to the rates of reports of those same diseases following other environmental triggers. *See* ECF No. 26-2. According to Dr. Efthimiou, the study "identifie[s] a statistically significant

---

[9] After denying Petitioner's request, as explained further below, the Chief Special Master ordered the Clerk of Court to strike the motion and associated attachments from the docket. *See* Order Denying Mot. Suppl. R. at 2, ECF No. 27. Nonetheless, the Court refers to the motion and attachments' ECF numbers for ease of reference.

signal that denoted a positive association" between the influenza vaccine and PMR, as well as the pneumococcal vaccine and PMR.  ECF No. 26-4 at 1–2 (citing ECF No. 26-2 at 7 tbl. 3).  The second proffered supplemental article is a 2024 report describing a single instance of a patient reporting PMR symptoms following influenza infection.  *See* ECF No. 26-3.  Dr. Efthimiou explains that the report exemplifies the continuing publication of "case reports . . . associating the onset of PMR illness with influenza infection."  ECF No. 26-4 at 2 (citing ECF No. 26-3). Petitioner argues that Dr. Efthimiou should be provided with "an opportunity to update his opinions on all similar matters still pending before" the Chief Special Master "to ensure a review of all current medical literature data published prior to issuing an entitlement decision."  ECF No. 26-1 at 8.  Petitioner maintains that the additional articles are "highly relevant [] to the issue of causation" and "[f]undamental fairness requires that [Petitioner] be allowed to supplement the record" with them.  *Id.* at 9.

   3. <u>The Chief Special Master's Denial of Petitioner's Motion to Supplement the Record</u>

   The Chief Special Master issued an Order denying supplementation on December 1, 2025. *See* Order Denying Mot. Suppl. R., ECF No. 27.  The Chief Special Master explained that Petitioner "provides no reasonable explanation for why" the two additional articles "could not have been [included] at the time [Petitioner] was briefing his claim."  *Id.* at 1.  "[B]oth items of literature were published in *2024*," the Chief Special Master emphasized, "and thus do not reflect newly-published studies that were unavailable."  *Id.* (emphasis in original).  The Chief Special Master rejected Petitioner's "fundamental fairness" arguments as "stretch[ing] Program goals of fairness . . . well beyond their breaking point."  *Id.* at 1–2.  Indeed, the Chief Special Master observed that "claims would never be resolved" if petitioners could "merely seek[] to take advantage of the time that has elapsed since [a] matter was briefed to bulwark [their] argument further."  *Id.* at 2.  Finally, the Chief Special Master determined that Petitioner's proffered evidence

16

was "not particularly integral to the claim's resolution." *Id.* Accordingly, the Chief Special Master denied Petitioner's Motion. *Id.*

    4.    <u>The Chief Special Master's Entitlement Decision</u>

The Chief Special Master also issued his Entitlement Decision on December 1, 2025, finding a lack of preponderant evidence supporting Petitioner's causation theory. *See* ECF No. 28 at 23. In the decision, the Chief Special Master reviewed Petitioner's medical records, *id.* at 2–4; the parties' expert reports, *id.* at 4–10; the parties' arguments, *id.* at 10–13; and the applicable law, *id.* at 13–19, before concluding that Petitioner failed to sufficiently establish a medical theory showing that the influenza or pneumococcal vaccines can cause PMR, *id.* at 20–23. The Chief Special Master's analysis proceeded in two parts: first, he reviewed the Vaccine Program's general treatment of PMR, *id.* at 20–21; and second, he analyzed Dr. Efthimiou's specific causation theory alongside Dr. Kinet's report, *id.* at 21–23.

The Chief Special Master began his analysis of the Vaccine Program's general treatment of PMR by noting that PMR "has not generally been deemed in the [Vaccine] Program *to be* vaccine-caused." *Id.* at 20 (emphasis in original). In support of this observation, the Chief Special Master cited seven cases—two of which were decided by the Chief Special Master—rejecting similar theories attempting to demonstrate that vaccines can cause PMR. *Id.* The Chief Special Master found *Thompson v. Secretary of Health & Human Services*, No. 18-1217V, 2023 WL 9053982 (Fed. Cl. Spec. Mstr. Dec. 5, 2023), to be "on-point" because it "also involve[d] the pneumococcal vaccine." ECF No. 28 at 20. Several of the other cited decisions (including those of the Chief Special Master) rejected similar causal theories that sought to establish that the influenza vaccine can cause PMR. *See id.* at 20–21. The Chief Special Master also noted his "specific[] familiar[ity] with the form of causation theory articulated by Dr. Efthimiou" because Dr. Efthimiou had "previously proposed a comparable theory in" another case the Chief Special

17

Master decided, *Munoz v. Secretary of Health & Human Services* (*Munoz I*), No. 21-1369V, 2024 WL 4113486 (Fed. Cl. Spec. Mstr. Aug. 12, 2024).  ECF No. 28 at 21.

The Chief Special Master also analyzed Dr. Efthimiou's specific causal theory as it pertains to Petitioner's circumstances.  *Id.* at 21–23.  The Chief Special Master found that Dr. Efthimiou failed to: (a) "show a relationship between the [influenza] or pneumococcal vaccine's wild infectious analogs and PMR"; (b) "identify a specific antigen associated with the development of PMR"; (c) "persuasively explain (other than by generalities about the immune process) how the specific vaccines in question would cause immune harm resulting in PMR symptoms simply due to innate immune stimulation"; or (d) "demonstrate that Petitioner himself possessed any genetic susceptibility making an adverse reaction resulting in PMR more likely."  *Id.* at 22.  Conversely, the Chief Special Master found that "Dr. Kinet effectively and persuasively rebutted Petitioner's causation contentions, showing that PMR is a common malady, and has little in the way of known triggers or mechanistic explanations."  *Id.*

Overall, the Chief Special Master concluded that Petitioner's causal theory sought to convert the vaccines' "understood capacity to provoke some immune response[] into something pathogenic, but without sufficient probative evidence to connect all the dots."  *Id.*  In other words, "[t]he fact that vaccines provoke an innate response does not mean that response causes injury."  *Id.*  Ultimately, the Chief Special Master determined that Petitioner lacked "sufficient probative evidence allowing for the conclusion that it is more likely than not that [influenza] and/or pneumococcal vaccine components can trigger PMR, alone or in combination."  *Id.*  Rather, Petitioner's theory involved "too many speculative assumptions about the roles prior exposure to the vaccine would play in setting up a disease process."  *Id.*  The Chief Special Master found that Petitioner's theory made "large leaps . . . from evidence that PMR *involves* the presence of certain

immune cells (T helper cells, or cytokines) to the conclusion that vaccines not only provoke the production of these cells, but would drive pathogenesis."[10]  *Id.* at 22–23 (emphasis in original). The Chief Special Master therefore denied compensation.  *Id.* at 23.

     5.      The Motion for Review

On December 13, 2025, Petitioner filed a Motion for Review of the Chief Special Master's Entitlement Decision.  *See* ECF No. 29.  Petitioner objects to the Chief Special Master's decision on the basis that the Chief Special Master: (1) abused his discretion in denying Petitioner's supplemental evidence; and (2) misapplied non-binding authority in assessing causation.  *See* Pet'r's Mem. of Law in Supp. of Pet'r's Mot. for Review at 6, ECF No. 29-1.  In support of his first objection, Petitioner emphasizes the leniency of the Vaccine Act's evidentiary standard, which is governed by fundamental fairness, and argues that application of that standard here confirms that the additional evidence is highly relevant and should be added to the record.  *Id.* at 11–15.  As for his second objection, Petitioner maintains that the Chief Special Master erred in applying non-binding decisions of the Office of Special Masters, which Petitioner argues conflict with more recent binding precedent.  *Id.* at 15–20, 22–25.  Finally, Petitioner claims that Dr. Efthimiou's theory meets the Vaccine Act's preponderant evidence standard.  *Id.* at 20–22.

Respondent filed his Memorandum in Response to Petitioner's Motion for Review on January 29, 2026, arguing that the Chief Special Master appropriately exercised his discretion in denying Petitioner's motion to supplement the record, and that the Chief Special Master neither abused his discretion nor erred as a matter of law in considering prior Office of Special Masters decisions.  *See* ECF No. 33 at 14–26.  Regarding supplementation, Respondent argues that the

---

[10] Cytokine is "a generic term for non[-]antibody proteins released by one cell population (e.g. primed T lymphocytes) on contact with a specific antigen, which act as intercellular mediators, as in the generation of an immune response."  *Dorland's Illustrated Medical Dictionary*, *supra* note 2, at 460.

Chief Special Master did not abuse the wide discretion afforded to special masters in managing their docket by refusing additional evidence after Petitioner had a full and fair opportunity to present his case. *Id.* at 19–26. As for the Chief Special Master's reliance on prior decisions, Respondent argues that Petitioner is challenging the weight the Chief Special Master afforded to Petitioner's expert opinion and medical literature, but Petitioner cannot establish that the Chief Special Master abused his discretion. *Id.* at 14–19. And because the Chief Special Master appropriately relied upon his experience in prior cases to inform his determination, Petitioner's objection must fail. *Id.* Petitioner's Motion for Review is fully briefed and ripe for disposition.

## II.  LEGAL STANDARDS

### A.  The Court's Standard of Review

Under the Vaccine Act, this Court has jurisdiction to review a special master's decision upon the timely request of either party. 42 U.S.C. § 300aa-12(e)(2). A court deciding a motion for review may:

> (A)  uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision,

> (B)  set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

> (C)  remand the petition to the special master for further action in accordance with the court's direction.

*Id.* §§ 300aa-12(e)(2)(A)–(C); *accord* Vaccine Rule 27(a)–(c). The three standards of review in 42 U.S.C. § 300aa-12(e)(2)(B) "vary in application as well as degree of deference," as each standard "applies to a different aspect of the judgment." *Munn v. Sec'y of Dep't of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

20

First, when reviewing the special master's factual findings, the Court applies the arbitrary and capricious standard. The scope of review is thus limited and highly deferential. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000); *see also Munn*, 970 F.2d at 870 (review of a special master's factual findings is "well understood to be the most deferential possible"); *Dougherty v. Sec'y of Health & Hum. Servs.*, 141 Fed. Cl. 223, 229 (2018) ("[S]pecial masters have broad discretion to weigh evidence and make factual determinations."). The Court does "not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). In other words, the Court should not "second guess the Special Master[']s fact-intensive conclusions." *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338 (Fed. Cir. 2010) (alteration in original) (quoting *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993)). "If the special master has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991).

Second, when a question of law is at issue—for example, a special master's interpretation of the Vaccine Act—the Court applies the "not in accordance with law" standard, which is de novo review. *See id.* at 1527; *Sanchez v. Sec'y of Health & Hum. Servs.*, 34 F.4th 1350, 1353 (Fed. Cir. 2022).

Third, when the special master excludes evidence or otherwise limits the record upon which he relies, the Court applies the abuse of discretion standard. *See Munn*, 970 F.2d at 870 n.10. Abuse of discretion may be found when (1) "the [special master's] decision is clearly

21

unreasonable, arbitrary, or fanciful"; (2) "the decision is based on an erroneous conclusion of the law"; (3) "the [special master's] findings are clearly erroneous"; or (4) "the record contains no evidence upon which" the special master rationally "could have based [his] decision." *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 635 (Fed. Cir. 2017) (quoting *Hendler v. United States*, 952 F.2d 1364, 1380 (Fed. Cir. 1991)).

**B.      The Standard for Admitting Supplemental Evidence Under the Vaccine Act**

Special masters "must consider all relevant and reliable evidence governed by principles of fundamental fairness to both parties." Vaccine Rule 8(b)(1); *see also Cedillo*, 617 F.3d at 1339 (indicating that by including "the terms '*relevant* and *reliable*,'" Vaccine Rule 8(b)(1) necessarily contemplates an inquiry into the soundness of scientific evidence to be considered by special masters" (emphases in original)).   Given this standard, "leniency is usually the appropriate response when resolving a request to allow new evidence into the record just before, or even during, an evidentiary hearing." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 05-1063V, 2016 WL 3034047, at *35 (Fed. Cl. Spec. Mstr. Apr. 25, 2016).   Leniency is less appropriate, however, "in the final stages of a proceeding . . . when the record is essentially closed." *Id.* at *36.   Courts treat such circumstances as a "request to reopen proceedings to permit the introduction of newly-discovered evidence." *Id.* (citing *Kaminski v. Sec'y of Health & Hum. Servs.*, 39 Fed. Cl. 253, 255, 258 (1997)).

Whether to admit supplemental evidence is a matter entrusted to the special master's discretion. *See Vant Erve v. Sec'y of Health & Hum. Servs.*, 39 Fed. Cl. 607, 611 (1997) (noting that a special master's "rulings regarding evidence are reviewed for abuse of discretion" (citing *Munn*, 970 F.2d at 870 n.10)), *aff'd after remand*, 232 F.3d 914 (Fed. Cir. 2000) (unpublished table decision).   In evaluating such a request, courts consider four factors: (1) "the nature of the proffered new evidence"; (2) "the prejudice to the parties"; (3) "the length of the delay"; and

22

(4) "the reason for the delay." *Id.* at 612; *see also Anklam v. Sec'y of Health & Hum. Servs.*, No. 2024-2161, 2026 WL 480017, at *2 (Fed. Cir. Feb. 20, 2026) (noting that the Federal Circuit has "previously assumed that the *Vant Erve* test provides the appropriate standard for reopening the record" (citing *Stone v. Sec'y of Health & Hum. Servs.*, 676 F.3d 1373, 1386 (Fed. Cir. 2012))). The factors, however, "are not of equal weight." *Vant Erve*, 39 Fed. Cl. at 612. The most important factor "is the nature of the proffered new evidence," which considers "the extent to which the new evidence is both relevant and affective of outcome." *Id.* Accordingly, "if the evidence is of marginal relevance and impact, the burden on the moving party increases dramatically with respect to the influence of the remaining factors." *Id.* (citing *Horner v. Sec'y of Health & Hum. Servs.*, 35 Fed. Cl. 23, 27 (1996)). Conversely, "if the evidence is highly relevant and clearly outcome determinative, the opposite follows—the importance of the remaining factors diminishes." *Id.* (citing *Kaminski*, 39 Fed. Cl. at 258–59).

## C.    The Standard of Causation in Vaccine Act Cases

The duty of a special master in a vaccine case is to determine, by a preponderance of evidence, whether the vaccine caused the alleged injury. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345 (Fed. Cir. 2010) (citing *Andreu v. Sec'y of Dep't of Health & Hum. Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009)). As described above, a petitioner may establish that a vaccine caused an alleged injury in one of two ways. 42 U.S.C. § 300aa-11(c)(1)(C); *Munn*, 970 F.2d at 865. First, a petitioner who has received a vaccine listed on the Table may establish a presumptive entitlement to compensation by showing the vaccine caused or significantly aggravated "any illness, disability, injury, or condition" set forth in the Table "within the time period after vaccine administration" outlined in the Table. 42 U.S.C. § 300aa-11(c)(1)(C)(i); *see also Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005) (describing a "Table injury"). Second, a petitioner who has received a vaccine listed on the Table, but whose

23

vaccine-related injury does not meet Table requirements, may recover under an "off-Table" theory. 42 U.S.C. §§ 300aa-11(c)(1)(C)(ii), 300aa-13(a)(1)(A); *Althen*, 418 F.3d at 1378.   Petitioner brought his claim under an off-Table theory.

For a petitioner to successfully recover for an off-Table claim, he or she must establish causation-in-fact.   *See* 42 U.S.C. §§ 300aa-11(c)(1)(C)(ii), 300aa-13(a)(1); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006).   This requires "preponderant evidence both that [the] vaccination[] [was] a substantial factor in causing the illness, disability, injury or condition and that the harm would not have occurred in the absence of the vaccination." *Pafford*, 451 F.3d at 1355 (citing *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999)).   Although the vaccination "must be a 'substantial factor'" in bringing about the injury, "it need not be the sole factor or even the predominant factor." *Id.* at 1357 (quoting *Shyface*, 165 F.3d at 1352–53).

To make the showing that "the vaccination brought about [the] injury," a petitioner must establish: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278.  "[N]either a mere showing of a proximate temporal relationship between vaccination and injury, nor a simplistic elimination of other potential causes of the injury suffices, without more, to meet the burden of showing actual causation" under the *Althen* three-prong test. *Id.* (citing *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1149 (Fed. Cir. 1992)).

Petitioners bear the burden to prove actual causation in off-Table cases by a preponderance of the evidence. *Id.* at 1278; 42 U.S.C. §§ 300aa-11(c)(1)(C)(ii), 300aa-13(a)(1)(A).[11]    The preponderant-evidence standard requires that a petitioner demonstrate the vaccine caused their injury "by a simple preponderance," *i.e.*, "'more probable than not' causation." *Althen*, 418 F.3d at 1279 (citing *Hellebrand v. Sec'y of Health & Hum. Servs.*, 999 F.2d 1565, 1572–73 (Fed. Cir. 1993)).    This standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993)).    In evaluating the evidence put forth to meet the preponderant-evidence standard, the special master has discretion to determine the relative weight of the evidence presented. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993); *see also Hibbard v. Sec'y of Health & Hum. Servs.*, 698 F.3d 1355, 1368 (Fed. Cir. 2012) (describing "the limited nature of [a reviewing court's] statutory role in reviewing

_____

[11] The Court notes that there are various Court of Federal Claims decisions on the application of the preponderance standard to the first prong of the *Althen* test. *Compare, e.g.*, *Hoffman v. Sec'y of Health & Hum. Servs.*, 172 Fed. Cl. 477, 495 (2024) ("[P]etitioners must provide preponderant evidence linking the vaccine received to the injury suffered via a *biologically plausible* theory." (emphasis added)) *with Munoz v. Sec'y of Health & Hum. Servs.* (*Munoz II*), 174 Fed. Cl. 276, 285 (2024) ("The standard of evidentiary proof under *Althen* prong one is preponderance of the evidence, not plausibility. . . . The Federal Circuit has 'consistently rejected theories that the vaccine only "likely caused" the injury and reiterated that a "plausible" or "possible" causal theory does not satisfy the standard.'" (quoting *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019)).    For an overview of the caselaw, see *Bechel v. Secretary of Health & Human Services*, 168 Fed. Cl. 602, 617–19 (2023).    The Federal Circuit recently reaffirmed that "a petitioner must prove a medical theory by a preponderance of the evidence that a vaccination can cause a particular injury." *Kalajdzic v. Sec'y of Health & Hum. Servs.* (*Kalajdzic II*), No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024).    In *Kalajdzic II*, the Federal Circuit saw no legal error in the special master's determination that the petitioners' medical theory had "too many omissions and gaps to conclude 'more likely than not'" that the vaccine "can cause" the alleged injury. *Id.* (quoting *Kalajdzic v. Sec'y of Health & Hum. Servs.* (*Kalajdzic I*), No. 17-792V, 2022 WL 2678877, at *24 (Fed. Cl. Spec. Mstr. June 17, 2022)).

25

factual determinations by special masters in Vaccine Act cases"). If a petitioner presents preponderant evidence on the three *Althen* prongs, thus establishing a prima facie case for liability, then the burden shifts to Respondent to prove under a preponderance standard that factors other than the vaccination caused the alleged injury. *See Althen*, 418 F.3d at 1278.

## III.  DISCUSSION

Petitioner has not demonstrated that the Chief Special Master's decision should be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Contrary to Petitioner's argument, the Chief Special Master appropriately exercised his discretion in refusing supplemental evidence where Petitioner had already been afforded a full and fair opportunity to present his claim. Further, the Chief Special Master did not err by considering the persuasive value of non-binding decisions while noting material differences between those cases and Petitioner's. Finally, the Chief Special Master applied the correct legal standard in weighing the relative persuasiveness and credibility of the parties' competing expert reports. Thus, Petitioner's Motion for Review is denied.

**A.    The Chief Special Master's Decision Denying Petitioner's Motion to Supplement the Record Was Not an Abuse of Discretion nor Contrary to Law.**

The Chief Special Master reasonably exercised his broad discretion in refusing Petitioner's supplemental evidence as Petitioner was given a full and fair opportunity to present his case. Though both articles of medical literature that Petitioner sought to introduce were published in 2024, Petitioner did not cite them in his rebuttal expert report nor during briefing on entitlement and offered no explanation as to why he failed to do so. The supplemental evidence was also not essential to the Chief Special Master's review of Petitioner's claim, as the articles were not particularly relevant or influential to the outcome.

Special masters have wide discretion in managing proceedings while ensuring each party has a full and fair opportunity to present their case. *Hovey v. Sec'y of Dep't of Health & Hum. Servs.*, 38 Fed. Cl. 397, 400 (1997). Such discretion extends to decisions regarding whether to conduct an evidentiary hearing, whether to limit expert testimony or filings, and even whether to hear or consider expert testimony at all. *See, e.g.*, *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1365–66 (Fed. Cir. 2020) (holding special master did not violate the petitioner's due process right by refusing to conduct an evidentiary hearing); *K.L. v. Sec'y of Dep't of Health & Hum. Servs.*, 134 Fed. Cl. 579, 605–06 (2017) (holding special master did not abuse his discretion in limiting expert testimony where the petitioner "had a 'full and fair opportunity to present [her] case'" (alteration in original) (quoting Vaccine Rule 3(b)(2))); *Bello v. Sec'y of Health & Hum. Servs.*, 158 Fed. Cl. 734, 749 (2022) (holding that the Chief Special Master's decision not to consider expert testimony represented "a reasonable exercise of his discretion to decide how to manage the case"). Thus, the Court reviews the Chief Special Master's decision not to admit Petitioner's supplemental evidence under the abuse of discretion standard. *See Vant Erve*, 39 Fed. Cl. at 611–12; *Munn*, 970 F.2d at 870 n.10.

Here, the Chief Special Master did not abuse his discretion in finding that Petitioner had a full and fair opportunity to present his case. By the time Petitioner sought to introduce the supplemental literature and expert report, Petitioner had filed 31 exhibits, including 13 medical and vaccination records, two expert reports, and 13 articles of medical and scientific literature. *See generally* Pet'r's Ex. List as of Jan. 31, 2025, ECF No. 20-2. Moreover, both of the proffered supplemental articles were published before Petitioner's rebuttal expert report was filed. *Compare* ECF No. 26-2 at 1 (published August 11, 2024) *and* ECF No. 26-3 at 1 (published October 2,

27

2024) *with* ECF No. 19-1 at 1 (Petitioner's rebuttal expert report filed on October 31, 2024).[12]  Yet

Dr. Efthimiou did not raise these articles in his rebuttal report, *see generally* ECF No. 19-1, nor

did Petitioner seek to include them during briefing on entitlement, which did not conclude until

nearly seven months after the second proffered article was published.  *Compare* ECF No. 26-3 at

1 (article published October 2, 2024) *with* ECF No. 24 (rebuttal brief filed April 30, 2025).

Petitioner offered no explanation for why he could not have previously submitted these articles,

either as part of Dr. Efthimiou's rebuttal report or at any time before the conclusion of entitlement

briefing.  Considering that the record was fully developed at the time the parties began briefing

entitlement, the Court cannot find that the Chief Special Master abused his broad discretion in

determining that Petitioner had a "full and fair opportunity to present [his] case."  Vaccine Rule

3(b)(2); *see, e.g.*, *Kreizenbeck*, 945 F.3d at 1365–66.

Setting aside Petitioner's opportunity to present these two additional pieces of literature

earlier in the proceedings, the Chief Special Master did not abuse his discretion in refusing to allow

Petitioner to supplement the record because the Chief Special Master reviewed the proffered

evidence and reasonably concluded that the articles were "not particularly integral to the claim's

resolution."  ECF No. 27 at 2; *see also Vant Erve*, 39 Fed. Cl. at 612 (indicating that "[t]he

paramount test is the nature of the proffered new evidence," which considers "the extent to which

the new evidence is both relevant and affective of outcome"); *Cedillo*, 617 F.3d at 1339

(emphasizing the special master's role and discretion in evaluating whether evidence is "*relevant*

---

[12] Petitioner states that "[t]he Oh, et. al., article [ECF No. 26-2] was published on August 22, 2024, and the Hayashi, et al., article [ECF No. 26-3] [was] published on October 1, 2024." ECF No. 29-1 at 17 n.4.  The Court notes that the first article does not bear a publication date, while the second article indicates it was published on October 2, 2024.  Regardless, Petitioner does not dispute the key fact that both articles were available prior to when "Dr. Efthimiou provided rebuttal testimony in response to Dr. Kinet," *id.*, which was six months before the conclusion of briefing on entitlement.

and *reliable*" (emphases in original) (quoting Vaccine Rule 8(b)(1))); *Anklam*, 2026 WL 480017, at \*3 (remanding for the special master to "exercise [her] discretion" in determining in the first instance whether the proffered evidence was sufficiently "relevant and affective of outcome" such that "the record should be reopened"); *Paluck v. Sec'y of Health & Hum. Servs.*, 104 Fed. Cl. 457, 484 (2012) (holding that the special master abused his discretion in admitting irrelevant evidence). Although the Chief Special Master did not give additional explanation as to why the articles were not integral to his review, the Court, upon its own review, finds that this conclusion was not an abuse of discretion.

The first article purportedly establishes a statistically significant relationship between the influenza vaccine and PMR, as well as the pneumococcal vaccine and PMR. *See* ECF No. 26-4 at 1–2 (citing ECF No. 26-2 at 7 tbl. 3). But the type of data relied upon and the methodology employed by the study undermine its reliability and support the Chief Special Master's conclusion that the study would not have changed the outcome of his decision. As Respondent points out, the study relies on the World Health Organization's International Pharmacovigilance Database, which collects self-reported data. *See* ECF No. 33 at 25–26, 26 n.9 (discussing ECF No. 26-2). The Center for Disease Control's similar Vaccine Adverse Event Reporting System ("VAERS") is generally given little weight in Vaccine Act cases due to the self-reported nature of the data. *See, e.g.*, *Analla v. Sec'y of Health & Hum. Servs.*, 70 Fed. Cl. 552, 558 (2006) ("The Court uniformly has upheld . . . concerns about the reliability of VAERS data."); *Ryman v. Sec'y of Dep't of Health & Hum. Servs.*, 65 Fed. Cl. 35, 43 (2005) (finding the special master "did not act arbitrarily or capriciously in refusing to accord substantial weight to [] VAERS reports"). The study also lacks a control group, which further undermines the reliability of its conclusions. *See* ECF No. 33 at 26 n.9 (discussing ECF No. 26-2); *Hazlehurst v. Sec'y of Health & Hum. Servs.*, 604 F.3d 1343, 1353

29

(Fed. Cir. 2010) (affirming special master's decision to afford little weight to a study based on its "lack of [] sufficient control group"). The potentially unreliable nature of the study's data and methodology supports the Chief Special Master's exercise of discretion in determining that the study was not material to the outcome of Petitioner's case.

Perhaps more importantly, even if the first proffered study reliably proved a statistically significant connection between the relevant vaccines and PMR, such a finding would most likely not have changed the Chief Special Master's conclusion that Petitioner failed to preponderantly establish a theory of causation. That conclusion was not based solely, or even primarily, on a lack of statistically significant evidence connecting PMR to the vaccines at issue. *See generally* ECF No. 28 at 20–23. Instead, as explained *infra* § III.B, the Chief Special Master's conclusion was based on the fact that Petitioner's theory (a) conflated the vaccines' intended capacity to provoke an immune response with the conclusion that such a response could cause PMR and (b) rested at such a high level of generality as to be unreliable in supporting causation. *See id.* at 22. The Court cannot conclude that a singular study proving a statistically significant connection between PMR and the vaccines at issue would necessarily have overcome either of these bases for the Chief Special Master's decision. Therefore, the Chief Special Master did not abuse his discretion in concluding that the article was not likely to impact the outcome of Petitioner's claim. *See* ECF No. 27 at 2.

The second article that Petitioner sought to introduce describes a single case report where one patient presented with PMR symptoms following an influenza infection. *See* ECF No. 26-3. As with the first article, the Chief Special Master acted within his broad discretion in finding that the second article was not particularly integral to resolving Petitioner's claim. Dr. Efthimiou's reports already relied on similar case series identifying instances of patients who presented PMR

symptoms following influenza vaccination. *See, e.g.*, ECF No. 16-5 (case series identifying 10 cases of PMR or GCA associated with influenza vaccination); ECF No. 16-6 (case series identifying two cases of PMR and 10 cases of GCA associated with influenza vaccination). The Chief Special Master found Petitioner's evidence, including these case series, did not constitute "sufficient probative evidence" to support Petitioner's theory that the influenza vaccine can cause PMR. ECF No. 28 at 22.

Even assuming the second report was probative and not duplicative, the outcome of the Chief Special Master's decision most likely would have remained the same. As noted by the Chief Special Master, evidence establishing a relationship between the influenza *infection* and PMR could "help bulwark the conclusion" that the influenza *vaccine* can cause PMR, but it is "not required for causation." *Id.* Because the Chief Special Master identified at least three other reasons why Petitioner's theory failed to establish that the influenza vaccine could cause PMR, there was no "conclusion that the vaccine could [] be causal" that the second article would "help bulwark." *Id.* In short, the Chief Special Master acted within his broad discretion when he determined that a single case report associating the influenza infection with PMR would not have changed his ultimate conclusion that Petitioner failed to establish his causal theory. Thus, the Court must not disturb his conclusion. *See, e.g.*, *Kreizenbeck*, 945 F.3d at 1365–66.

The cases Petitioner cites do not compel a different result. First, Petitioner relies on *Horner*, where the Court of Federal Claims held that the special master abused his discretion by refusing to reopen the evidentiary record to allow the petitioners to introduce their vaccination record. 35 Fed Cl. at 28. As the court explained, the "extremely probative" value of the vaccination record outweighed the "substantial inconvenience" to the parties. *Id.* The *Horner* petitioners located the vaccination record one month after the special master denied entitlement

31

due to the petitioners' inability to prove receipt of the vaccine. *Id.* at 25. The court emphasized that the vaccination record "may be the difference between the success and failure of the petitioners' claim." *Id.* at 27. Thus, in light of its "critical importance," the special master was required under principles of "fundamental fairness" to at least consider its authenticity.[13] *Id.* The same is not true of Petitioner's proffered medical literature, which the Chief Special Master reasonably concluded was "not particularly integral to the claim's resolution." ECF No. 27 at 2.

Second, Petitioner places much weight on the *Vant Erve* factors, but application of those factors here only confirms that that Chief Special Master did not abuse his discretion. The *Vant Erve* factors consider: (1) "the nature of the proffered new evidence"; (2) "the prejudice to the parties"; (3) "the length of the delay"; and (4) "the reason for the delay," with the "paramount test" being "the extent to which the new evidence is both relevant and affective of outcome." 39 Fed. Cl. at 612. The facts in *Vant Erve* are illustrative. There, Respondent sought to reopen the record to introduce new medical information indicating that the petitioners' disease was genetically inherited, rather than caused by a vaccine. *Id.* at 610. The Court of Federal Claims held that the special master erred in not considering the new evidence because, "if allowed and not rebutted," the medical information constituted "conclusive" evidence "that the liability decision [was] simply wrong." *Id.* at 613. Like in *Horner*, the *Vant Erve* court found that the outcome-determinative

---

[13] In contrast, other courts have denied supplementation where the proffered evidence was not relevant or likely to influence the outcome of the petitioner's case. *See Stone*, 676 F.3d at 1386 (finding that "because it was not clear that the [proffered] article would have strengthened the petitioner's case or affected the special master's decision, the petitioner has not shown that he was prejudiced by the special master's denial of the [supplementation] motion"); *Johnson v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 712, 728 (1995) (concluding the special master's error in failing to consider certain expert reports was harmless because they did "not contain evidence that is sufficiently detailed or probative of the causation issue to change the outcome"), *aff'd*, 99 F.3d 1160 (Fed. Cir. 1996).

nature of the evidence, which involved medical information specific to the petitioners, outweighed the prejudice caused by the movant's delay.

Conversely, here, the Chief Special Master reasonably concluded that the medical articles Plaintiff sought to introduce were neither relevant nor particularly influential to the outcome. ECF No. 27 at 2. It is telling that in both *Horner* and *Vant Erve*, the movant sought to introduce supplemental evidence specific to the petitioners' medical history that could have a direct impact on the outcome of the entitlement decision. Instead, Petitioner seeks an opportunity for Dr. Efthimiou to "update his opinions on all similar matters still pending before the [Chief Special Master]" with two general pieces of medical literature. ECF No. 26-1 at 8. "[F]undamental fairness," Vaccine Rule 8(b)(1), does not require that Petitioner be given such an opportunity as he has already had a "full and fair opportunity to present [his] case," Vaccine Rule 3(b)(2). Given that the supplemental evidence was "of marginal relevance and impact," Petitioner's burden "increases dramatically with respect to the influence of the remaining factors." *Vant Erve*, 39 Fed. Cl. at 612. The Chief Special Master concluded that Petitioner had not met his dramatically increased burden given that his delay in seeking to supplement the record was several months in duration and was wholly caused by Petitioner. *See* ECF No. 27 at 1–2. Under the circumstances, the Court finds that this was a reasonable exercise of discretion.

Finally, Petitioner cites *Plavin v. Secretary of the Department of Health & Human Services*, 40 Fed. Cl. 609, 623 (1998), for the proposition that the length of the delay is "of diminished importance" when final judgment has not been entered and the new evidence is "highly probative" of entitlement. In *Plavin*, the special master reopened the record approximately three months after the entitlement decision because "the world's acknowledged expert" on the diagnosis at issue had sent a letter indicating he "was troubled with his initial testimony as recorded in the transcript and

that there is actually no concrete evidence that supports the [causation] theory" at issue. 40 Fed. Cl. at 612–13. The entitlement decision relied heavily on this expert's testimony, and two other cases applying it. *Id.* The Court of Federal Claims found that the special master had not abused his discretion in reopening the record where the expert had either "changed his mind or disagreed with the way his prior evidence had been analyzed, [and] the outcome of at least some of the [cases that relied on his expertise] would likely change." *Id.* at 623. Unlike in *Plavin*, here, the Chief Special Master reasonably concluded that Petitioner's supplemental evidence was unlikely to change the outcome. ECF No. 27 at 1–2. Accordingly, the Chief Special Master did not abuse his discretion in refusing to consider Petitioner's supplemental evidence.

In sum, the Chief Special Master did not err in refusing to consider Petitioner's proffered supplemental evidence because Petitioner had a full and fair opportunity to present his case and the Chief Special Master reasonably exercised his discretion in determining that the supplemental evidence was not particularly relevant or influential to the outcome.

**B.      The Chief Special Master Did Not Abuse His Discretion nor Err as a Matter of Law in Determining That Petitioner Failed to Establish That the Influenza Vaccine Can Cause PMR.**

In reaching his entitlement decision, the Chief Special Master acted consistent with the law and reasonably exercised his discretion. Petitioner's objection to the Chief Special Master's decision under *Althen* prong one involves two distinct, though related, arguments—that the Chief Special Master: (a) improperly relied on non-binding authority; and (b) applied an erroneously strict standard in reviewing Dr. Efthimiou's causal theory. *See* ECF No. 29-1 at 15–25. Upon review, the Court finds neither argument is persuasive.

34

1.      The Chief Special Master Did Not Err in Considering Non-Binding Caselaw.

Contrary to Petitioner's assertion, the Chief Special Master's consideration of prior Office of Special Masters decisions did not constitute legal error.  Although such past decisions are not binding, *see Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998), special masters are also not "required to ignore precedent and relitigate causation theories that have already been litigated repeatedly," *Barrios v. Sec'y of Health & Hum. Servs.*, No. 23-230V, 2025 WL 777259, at *5 (Fed. Cl. Feb. 18, 2025).  Indeed, Petitioner concedes that "special masters can consider non-binding decisions [as] persuasive [authority]."  ECF No. 29-1 at 16; *see also Goff v. Sec'y of Health & Hum. Servs.*, 177 Fed. Cl. 506, 534 (2025) (finding that a special master "recognized the proper legal standard when considering" prior special masters' decisions where she "explain[ed] that although the prior decisions [of special masters] did not control the analysis, they could inform that analysis").  Here, the Chief Special Master appropriately considered prior decisions of special masters as "persuasive but not binding authority."  ECF No. 28 at 13 n.9; *see also id.* at 20 (stating that "[a]ll of these [prior Office of Special Masters] decisions provide persuasive, useful guidance for resolving this matter").  The Chief Special Master, therefore, did not give inappropriate weight to these past decisions.

Petitioner, however, contends that this case "contains significant material differences that are factually distinguishable and relevant from all prior adverse decisions."  ECF No. 29-1 at 16.  For example, Petitioner asserts that the Chief Special Master "failed to acknowledge that Dr. Efthimiou's testimony was based on novel published literature that could not have been discussed in the prior decisions given the chronology."  *Id.* at 18.  Though the Chief Special Master began his analysis by discussing the treatment of PMR causation theories in the Vaccine Act Program generally, as well as his own experience in evaluating similar theories and evidence, he then considered whether Dr. Efthimiou offered any new theories or evidence that warranted a different

35

conclusion than in past cases.  ECF No. 28 at 20–23.  Based on his review, the Chief Special

Master concluded that "Petitioner ha[d] not otherwise offered any more recently-published

scientific or medical studies or articles that would suggest a likely PMR-vaccine association."  *Id.*

at 22.  The Court finds no error in this approach.  *See Morgan v. Sec'y of Health & Hum. Servs.*,

850 F. App'x 775, 784 (Fed. Cir. 2021) (finding "no error in the special master's causation

analysis" where the special master "found an absence of evidence in the record and a lack of

authority in prior Vaccine Act decisions supporting" the petitioner's theory of causation).

Petitioner also argues that the Chief Special Master failed to acknowledge that in

*Thompson*, 2023 WL 9053982, at *16, the petitioner's expert conceded that infections were not

medically known triggers of PMR.  *See* ECF No. 29-1 at 17.  But the Chief Special Master

considered Dr. Efthimiou's reports and evidence postulating a connection between the vaccines'

infectious analogs and PMR; he was not required to specifically identify immaterial distinctions

between the instant case and prior Office of Special Masters decisions.  *See* ECF No. 28 at 4–8,

21–23.  Overall, the Chief Special Master sufficiently identified and considered the relevant

differences between the prior decisions he relied upon and Petitioner's case.  *See, e.g.*, *id.* at 21

(distinguishing *Giesbrecht v. Sec'y of Health & Hum. Servs.*, No. 16-1338V, 2023 WL 2721578

(Fed. Cl. Spec. Mstr. Mar. 30, 2023), as "turn[ing] in part on a special master's finding that

petitioner's PMR diagnosis had not been substantiated"); *id.* (distinguishing *Munoz I* as involving

a different vaccine).[14]

---

[14] As the Chief Special Master notes, *see* ECF No. 28 at 21 n.10, *Munoz I* is currently
before the Federal Circuit on appeal.  Petitioner claims that such an appeal undermines the finality
of the judgment in that case and renders the Chief Special Master's reliance on it "invalid."  ECF
No. 29-1 at 16; *see also Munoz I*, No. 21-1369V, ECF No. 79 (entering final judgment).  Contrary
to Petitioner's assertion, however, "[i]t is fundamental that the mere pendency of an appeal does
not, in itself, disturb the finality of a judgment."  *Wedbush, Noble, Cooke, Inc. v. S.E.C.*, 714 F.2d
923, 924 (9th Cir. 1983) (citing *Hovey v. McDonald*, 109 U.S. 150, 161 (1883)).  In any event, the

The Chief Special Master also appropriately considered the relevant similarities between prior cases and Petitioner's claim. *See, e.g.*, *id.* at 20 (describing *Thompson*, 2023 WL 9053982, at *2, as "on-point" because it "also involve[d] the pneumococcal vaccine" and a causal theory "that the vaccine promoted . . . upregulation of cytokines, leading to immune dysregulation followed by an autoimmune condition"); *id.* at 20–21 (explaining that the Chief Special Master rejected a similar theory in *Sciortino v. Sec'y of Health & Hum. Servs.*, No. 22-99V, 2024 WL 4579389, at *12–13 (Fed. Cl. Spec. Mstr. July 24, 2024), which "relie[d] heavily on a cytokine-driven process that conflate[d] innate and immune phases," and lacked "a persuasive or reliable showing that [] such [an] upregulation of cytokines is likely to trigger a disease process"); *id.* at 21 (acknowledging the Chief Special Master's familiarity with Dr. Efthimiou's theory of causation because Dr. Efthimiou submitted a "strikingly comparable" report in *Munoz I*).  In sum, the Chief Special Master considered the relevant similarities and material differences between the prior special master decisions and Petitioner's case before analyzing whether Petitioner provided a basis for finding that the influenza vaccine can cause PMR.

Petitioner raises two additional arguments for why the Chief Special Master erred in relying on prior decisions of special masters.  First, Petitioner argues that the rationale for "analogizing the case at hand *to favorable precedents*" does not apply to "us[ing] prior <u>unfavorable, adverse</u> special master decisions as persuasive legal precedent."  ECF No. 29-1 at 15–16 (emphases in original) (citing *In re Pennington Seed, Inc.*, 466 F.3d 1053 (Fed. Cir. 2006)).  Second, Petitioner contends that the cases the Chief Special Master relied upon are inconsistent with the Federal

---

Chief Special Master relied on *Munoz I* as "reflect[ing] [his] own experience directly in evaluating Dr. Efthimiou's opinion," and appropriately considered its relative weight in light of the fact that it is currently on appeal.  ECF No. 28 at 21 n.10.

37

Circuit's more recent decision in *Doles v. Secretary of Health & Human Services*, No. 2023-2404, 2025 WL 1177875 (Fed. Cir. Apr. 23, 2025).  ECF No. 29-1 at 22–25.

As for the first argument, the Court finds no basis for Petitioner's purported distinction between "favorable" and "unfavorable" precedent.  Precedent that is favorable to one party is often unfavorable to the other party.  The case Petitioner cites did not announce any distinction between "favorable" and "unfavorable" precedent; rather, the Federal Circuit in *In re Pennington Seed* merely adopted the reasoning of a decision of the U.S. Court of Appeals for the D.C. Circuit because the Federal Circuit found "its reasoning persuasive."  466 F.3d at 1057.  In fact, there is no material distinction between the Federal Circuit's adoption of the persuasive yet non-binding reasoning of the D.C. Circuit and the Chief Special Master's discussion of the persuasive yet non-binding aspects of previous special master decisions.  *Compare id.* (acknowledging the D.C. Circuit case was "persuasive" but "not binding") *with* ECF No. 28 at 13 n.9 (acknowledging the "persuasive but not binding authority" of prior Office of Special Masters decisions).

Petitioner appears to argue that the Chief Special Master's use of "unfavorable" precedent in determining Petitioner failed to meet *Althen* prong one constitutes legal error because "the purpose of the Vaccine Act's preponderance standard test is to allow a finding of causation."  ECF No. 29-1 at 15–16 (citing *Althen*, 418 F.3d at 1280).  Although *Althen* did indicate that the Vaccine Act's preponderance standard is intended to permit the use of circumstantial evidence in evaluating causation, given the lack "of complete and direct proof of how vaccines affect the human body," 418 F.3d at 1280, *Althen* said nothing about whether special masters may consider prior Office of Special Masters decisions in applying that standard.  And other judges of this court have upheld special masters' reliance on non-binding decisions "unfavorable" to petitioners. *See Barrios*, 2025 WL 777259, at *5 (finding no error in the Chief Special Master's reliance on prior Office of Special

38

Masters decisions denying similar claims for lack of causation); *Dougherty*, 141 Fed. Cl. at 229–30 (similar). Petitioner's reliance on *Althen*'s general statement regarding the purpose of the Vaccine Act's preponderance standard to support a distinction between "favorable" and "unfavorable" authority is, therefore, unavailing.

As for the second argument, Petitioner overstates the impact of the Federal Circuit's decision in *Doles*. According to Petitioner, *Doles* stands for the proposition that "individual cases associating vaccinations with onset of the same illness are relevant and reliable types of evidence supporting general causation." ECF No. 29-1 at 22–23. Petitioner asserts that, in relying on pre-*Doles* decisions, the Chief Special Master "commit[ted] legal error by concluding that case reports are a weak, less probative form of evidence." *Id.* at 24. This argument rests on the erroneous premise that *Doles* requires special masters to afford specific weight to certain types of evidence.

In *Doles*, the Federal Circuit narrowly held that the Court of Federal Claims erred in faulting a study's relevance "solely for the study's lack of *statistically significant* conclusions regarding patients identically situated to [the petitioner]." 2025 WL 1177875, at *8 (emphasis in original). In other words, *Doles* held that a special master need not automatically ignore medical literature merely due to a lack of statistical significance. *Id.* (agreeing with the petitioner's argument that "[i]n barring any reliance on [the study's] non-statistically significant findings," the Court of Federal Claims "set too high a standard for relevant evidence"). Contrary to Petitioner's view, the Federal Circuit did not require that special masters afford specific weight to case reports, nor did it prohibit special masters from exercising their judgment and expertise in determining the weight to afford case reports when reviewing the evidence. *See Exum v. Sec'y of Health & Hum. Servs.*, 178 Fed. Cl. 627, 651 (2025) (rejecting the petitioner's argument that, under *Doles*, the Chief Special Master erred in declining to afford significant weight to case reports), *appeal*

*docketed*, No. 2026-1178 (Fed. Cir. Nov. 20, 2025).  Petitioner is therefore incorrect in asserting that "[a]ll prior adverse cases conflict with [*Doles*]" because they did not afford significant weight to case reports.  ECF No. 29-1 at 22.

Even if Petitioner's interpretation of *Doles* was correct, the Chief Special Master did not rely on the prior Office of Special Masters decisions to determine what weight to afford Dr. Efthimiou's cited case reports.  For example, while the Chief Special Master noted that the special master in *Kelly v. Secretary of Health & Human Services*, No. 17-1475V, 2022 WL 17819157, at *10–11 (Fed. Cl. Spec. Mstr. Oct. 12, 2022), found "reliance on case reports weak proof," ECF No. 28 at 21, he did not adopt that finding to reject Dr. Efthimiou's cited medical literature. Instead, the Chief Special Master relied on this decision and others in considering their treatment of PMR as not being vaccine-caused.  *See id.* at 20 (noting these prior decisions "provide persuasive, useful guidance").  Thus, the Court is not persuaded by Petitioner's reliance on *Doles* to challenge the Chief Special Master's discussion of non-binding authority.

Overall, the Chief Special Master did not err in considering prior special master decisions because he appropriately considered the persuasive yet non-binding authority of these decisions and analyzed the material differences between them and Petitioner's case.

2.    <u>The Chief Special Master Applied the Appropriate Legal Standard and Reasonably Exercised His Discretion in Evaluating Competing Expert Reports.</u>

The Chief Special Master properly exercised his discretion in considering the weight and credibility of the parties' competing expert witnesses before concluding that Petitioner had not met his burden of establishing *Althen* prong one by preponderant evidence.  Counter to Petitioner's assertion, the Chief Special Master did not inappropriately view Petitioner's causation theory, or the evidence offered in support of that theory, through a laboratorial lens.

40

Petitioner argues that the Chief Special Master applied too rigorous a standard in evaluating Dr. Efthimiou's causal theory. *See, e.g.*, ECF No. 29-1 at 10 (arguing that the Chief Special Master "erroneously narrowed the probative relevance of the medical evidence presented in this record"); *id.* at 23 (arguing that the Chief Special Master "implicitly viewed the individual case data from the medical literature through the rigorous lab lens, narrowing the legal probative value of the vaccine data circumstantially supporting Dr. Efthimiou's testimony"). Petitioner is correct that "[m]edical literature and epidemiological evidence must be viewed . . . not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Andreu*, 569 F.3d at 1380. Petitioner is incorrect, however, in asserting that is what the Chief Special Master did here. Medical and scientific research generally requires "*very near certainty*—perhaps 95% probability." *Id.* (emphasis in original) (quoting *Liable v. Sec'y of Health & Hum. Servs.*, No. 98-120V, 2000 WL 1517672, at *18 (Fed. Cl. Sept. 7, 2000). Conversely, "determination of causation in fact under the Vaccine Act involves ascertaining whether a sequence of cause and effect is *'logical' and legally probable, not medically or scientifically certain*." *Id.* (emphasis in original) (quoting *Knudsen v. Sec'y of Dep't of Health & Hum. Servs.*, 35 F.3d 543, 548–49 (Fed. Cir. 1994)). The Federal Circuit has "ma[de] clear that a claimant's theory of causation must be supported by a 'reputable medical or scientific explanation.'" *Id.* at 1379 (quoting *Althen*, 418 F.3d at 1278); *see also Kalajdzic v. Sec'y of Health & Hum. Servs.* (*Kalajdzic II*), No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (reaffirming that "a petitioner must prove a medical theory by a preponderance of the evidence that a vaccination can cause a particular injury").

That is all that the Chief Special Master found lacking in this case. *See, e.g.*, ECF No. 28 at 22 (finding Petitioner's theory "is ultimately missing [] sufficient probative evidence allowing

41

for the conclusion that it is more likely than not that [influenza] and/or pneumococcal vaccine components can trigger PMR, alone or in combination"); *accord Kalajdzic II*, 2024 WL 3064398, at \*2 (finding no legal error in the special master's determination that the petitioners' medical theory had "too many omissions and gaps to conclude 'more likely than not'" that the vaccine "can cause" the alleged injury (quoting *Kalajdzic v. Sec'y of Health & Hum. Servs.* (*Kalajdzic I*), No. 17-792V, 2022 WL 2678877, at \*24 (Fed. Cl. Spec. Mstr. June 17, 2022))).  The Chief Special Master did not ignore Petitioner's cited case series merely because they lacked statistical significance.  Instead, he considered the case series and other medical literature offered by Dr. Efthimiou, *see* ECF No. 28 at 4–8, and reasonably exercised his discretion in determining that they did not make up for the "large leaps" in Dr. Efthimiou's theory nor overcome the "speculative assumptions about the roles prior exposure to the vaccine would play," *id.* at 22–23.

Specifically, the Chief Special Master found that Petitioner failed to (a) establish a relationship between either the influenza infection or the pneumococcal infection and PMR; (b) "identify a specific antigen associated with the development of PMR"; (c) explain how either vaccine could "cause immune harm resulting in PMR symptoms simply due to innate immune stimulation"; or (d) demonstrate Petitioner "possessed any genetic susceptibility making an adverse reaction resulting in PMR more likely." *Id.*  The Chief Special Master did not inappropriately require Petitioner to prove causation by a standard of medical certainty; rather, the Chief Special Master reasonably concluded that Petitioner had not "preponderantly established" that the vaccines at issue can cause PMR. *Id.* at 21–22.  This analysis is consistent with the Act.[15]

---

[15] The Court also notes that the Chief Special Master did not implicitly impose a more rigorous standard by relying on caselaw predating *Doles*.  For the reasons explained, *see supra* § III.B.1, the Chief Special Master's reliance on persuasive non-binding authority was consistent with the Federal Circuit's decision in *Doles*.

Petitioner raises several objections to the four shortcomings that the Chief Special Master identified in Petitioner's causation theory. None are persuasive.

First, Petitioner argues that the supplemental literature that the Chief Special Master refused to consider "speaks directly to medically finding a rare association" between PMR and influenza infection. ECF No. 29-1 at 20 n.5 (citing ECF No. 26-3). Yet, as previously discussed, *see supra* § III.A, the Chief Special Master reviewed the supplemental literature and reasonably determined that it was "not particularly integral to the claim's resolution." ECF No. 27 at 2. Indeed, the Court strains to understand how a case report identifying a single individual who displayed symptoms of PMR following an influenza infection could have shown, more likely than not, a relationship between the influenza "vaccine's wild infectious analog[] and PMR." ECF No. 28 at 22. Even assuming this case report could have addressed this specific inadequacy, the Chief Special Master explained that evidence establishing this relationship was "not required for causation" and went on to identify at least three other instances where Petitioner's causation theory lacked "sufficient probative evidence." *Id.*

Second, Petitioner argues that he demonstrated that he possessed a specific genetic susceptibility to PMR because Respondent's own expert, Dr. Kinet, conceded that Petitioner's "medical history showed a predisposition for PMR." ECF No. 29-1 at 20 n.6 (citing ECF No. 28 at 9). While Dr. Kinet observed that Petitioner may have "already had a predisposition to PMR, *if one grants that his reportedly similar episode of joint pain in 2010 or 2011 was PMR*," Dr. Kinet made this assumption for the sake of explaining why such a susceptibility would undermine, rather than support, Petitioner's causation theory. ECF No. 18-1 at 5 (emphasis added). That is, if Petitioner has "received many vaccinations, including several closely spaced ones" since his "declared predisposition," then "it is not clear why these closely spaced vaccinations, or any of his

other recent vaccinations, did not lead to PMR." *Id.* In describing Dr. Kinet's report, the Chief Special Master did note that Dr. Kinet "emphasized the significance of what he viewed from Petitioner's medical history as a *possible* predisposition to PMR." ECF No. 28 at 9 (emphasis added). But, when explaining why Petitioner failed to establish *Althen* prong one, the Chief Special Master did not discuss the impact of any such genetic susceptibility because he reasonably concluded that Petitioner failed to demonstrate such a susceptibility exists in the first instance. *Id.* at 22. Petitioner's only disagreement with this conclusion is his incorrect assertion that Dr. Kinet agreed that Petitioner had a predisposition to PMR. ECF No. 29-1 at 20 n.6.

Third, Petitioner contends that "[a]lthough there is no legal requirement for a specific antigen to be identified to prove causation under the Act, Dr. Efthimiou's testimony did identify a specific immune cell, T cells." *Id.* at 21. While Dr. Efthimiou discussed "evidence that PMR *involves* the presence of [T cells]," the Chief Special Master concluded that Dr. Efthimiou's theory made "large leaps" from the presence of T cells "to the conclusion that vaccines not only provoke the production of these cells, but would drive pathogenesis." ECF No. 28 at 22–23 (emphasis in original). Put differently, although Dr. Efthimiou may have identified evidence of immune cells involved in PMR, the Chief Special Master reasonably determined that Dr. Efthimiou failed to preponderantly demonstrate that vaccines provoked the production of such cells, and moreover, that such production could lead to PMR. *Id.*

The Chief Special Master also appropriately considered the weight and credibility of the competing expert witness reports. *See, e.g.*, *id.* at 22 (rejecting Dr. Efthimiou's arguments as "unpersuasive" and lacking "sufficient probative evidence to connect all the dots" while finding Dr. Kinet's opinion "effective[] and persuasive[]"). Special masters "are often faced with the 'battle of the experts'" and must "weigh and assess" expert opinions "in the light of their own

44

acquired specialized knowledge and expertise." *Sword v. United States*, 44 Fed. Cl. 183, 188 (1999). It is "quite clear that" special masters may use the *Daubert* factors "to assess expert witnesses' methodology." *Cedillo*, 617 F.3d at 1339 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993)). "These factors are (1) general acceptance in the scientific community, (2) whether the theory has been subjected to peer review and publication, (3) whether the theory can and has been tested, and (4) whether the known potential rate of error is acceptable." *Id.* While the *Daubert* inquiry focuses "on principles and methodology, not on the conclusions they generate, conclusions and methodology are not entirely distinct from one another." *Id.* (internal quotation marks omitted) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Accordingly, a special master "may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

Here, the Chief Special Master reviewed the competing expert opinions, *see* ECF No. 28 at 4–10, before concluding that Dr. Efthimiou's causal theory involved "too many speculative assumptions" as well as "large leaps [] made from [the cited] evidence . . . to [Dr. Efthimiou's] conclusion that vaccines" can lead to PMR. *Id.* at 22–23. Conversely, the Chief Special Master found Dr. Kinet's opinion "effective[] and persuasive[]" in "rebutt[ing] Petitioner's causation contentions" and "showing that PMR is a common malady, and has little in the way of known triggers or mechanistic explanations." *Id.* at 22. Petitioner argues that the Chief Special Master erred in his analysis of Dr. Efthimiou's expert opinion by imposing a heightened causation standard requiring medical certainty or statistical significance. *See* ECF No. 29-1 at 20–22. But the Chief Special Master did not disregard the literature that Dr. Efthimiou cited for lack of medical certainty or statistical significance. Instead, the Chief Special Master found Dr. Efthimiou's theory less credible and persuasive as compared to Dr. Kinet's opinion because Dr. Efthimiou sought to

"convert the intended effect of vaccination . . . into something pathogenic [] without sufficient probative evidence."  ECF No. 28 at 22.  The Chief Special Master's reasonable resolution of the competing expert opinions in this case, based on his assessment of the relative persuasiveness and credibility of their methodologies, is not for the Court to second-guess.  *Porter*, 663 F.3d at 1249; *Cedillo*, 617 F.3d at 1338; *Hodges*, 9 F.3d at 961.

Finally, to the extent that Petitioner asserts that the Chief Special Master's analysis of Petitioner's causal theory is inconsistent with the Federal Circuit's decision in *Doles*, Petitioner's argument continues to rely on his erroneous interpretation of that case.  *See* ECF No. 29-1 at 25 (arguing that the Chief Special Master's "rationale for why the medical literature evidence in this case failed the legally probable burden" is inconsistent with *Doles*' finding that the circumstantial scientific evidence in that case "was sufficient to establish [the petitioner's] medical theory" (citing *Doles*, 2025 WL 1177875, at *8)).  As previously explained, *Doles* did not make a finding as to the sufficiency of case reports or similar circumstantial evidence in satisfying the Vaccine Act's legal preponderance standard.  *See supra* § III.B.1 (discussing *Doles*, 2025 WL 1177875, at *8).  Rather, the Federal Circuit merely held that the Court of Federal Claims erred in discrediting a study "solely for the study's lack of *statistically significant* conclusions."  *Doles*, 2025 WL 1177875, at *8 (emphasis in original).  Because the Chief Special Master did not reject Petitioner's medical evidence exclusively for its lack of statistical significance and instead weighed that evidence against Dr. Kinet's competing evidence under the Vaccine Act's preponderance standard, the Chief Special Master did not repeat the Court of Federal Claims' error in *Doles*.

Accordingly, the Chief Special Master applied the appropriate legal standard in evaluating Dr. Efthimiou's and Dr. Kinet's competing expert reports and reasonably exercised his discretion, based on his accumulated expertise in the field, in evaluating the relative persuasiveness and

credibility of their opinions.  The Court declines Petitioner's request to disturb the Chief Special

Master's well-reasoned conclusion.

## IV.  CONCLUSION

For the foregoing reasons, Petitioner's Motion for Review (ECF No. 29) is **DENIED**.  The

Clerk is directed to enter judgment accordingly.

**SO ORDERED.**


Dated: May 29, 2026                                    */s/ Kathryn C. Davis*
                                                       KATHRYN C. DAVIS
                                                       Judge